W. J. POCK, as Treasurer of Publishers' Association of New York City (on behalf of its member, Hearst Consolidated Publications, Inc.), Plaintiff,

v.

NEW YORK TYPOGRAPHICAL UNION NO. 6, Defendant.

United States District Court
S. D. New York.
Nov. 7, 1963.

Townley, Updike, Carter & Rodgers, New York City, for plaintiff. James W. Rodgers, Andrew L. Hughes, New York City, of counsel.

John J. Sheehan, New York City, for defendant.

WYATT, District Judge.

This motion is by plaintiff, the representative of an employer, for an order directing defendant Union to arbitrate a "grievance" said to arise under a collective bargaining agreement. The motion is recited to be under Section 301(a) of the Labor Management Relations Act, 1947 (29 U.S.C. § 185(a); part of the "Taft-Hartley Act") and under the United States Arbitration Act (9 U.S.C. § 1 and following).

The action is for the same relief as is asked on this motion. Plaintiff duly filed his complaint herein and shortly thereafter the present motion followed. Defendant joined issue by answer and has filed an affidavit opposing this motion.

The facts do not appear to be in dispute.

Plaintiff is the Treasurer of an unincorporated association of the publishers of the principal newspapers in the City of New York, including the corporation which publishes the "New York Journal-American". (The spelling "Pock" for plaintiff in the complaint and summons prevails over the spelling "Poch" in the motion papers.)

Under New York law, the president or treasurer of an unincorporated association may maintain an action for it (General Associations Law, McKinney's Consol.Laws, c. 29, § 12). Plaintiff evidently relies on this authority, coupled with Fed.R.Civ.P. 17(b); the action is not in the "common name" of the association under Fed.R.Civ.P. 17(b) (1).

Defendant is a labor organization representing those engaged in typographical work in the composing rooms of the newspapers. It is not questioned that such an organization may be sued in this Court as an "entity" since it represents "employees in an industry affecting commerce". 29 U.S.C. § 185(b); Macneish v. N. Y. Typographical Union No. 6, 205 F.Supp. 558 (S.D.N.Y.1962). This was assumed in Publishers' Ass'n. of New York City v. New York Mailers' Union Number Six, 317 F.2d 624 (2d Cir. 1963).

On December 8, 1962—a time when there was no collective bargaining agreement in effect between the parties— the Union called a strike against some of the major newspapers in New York, including the Journal-American. On that date, a representative of the Union ordered "off the floor" the General Foreman (hereafter "Foreman") of the composing room of the Journal-American. There is some difference as to the details of what happened next after the order but the difference is of no significance here; at least, the Foreman did not immediately leave the Journal-American building.

On December 26, 1962, the representative of the Union filed with its President a complaint against the Foreman charging the latter with a violation of Article V, Section 1, of the By-Laws of the International Typographical Union (the parent of the defendant local Union) in that he allegedly "committed a disrep-

utable act and conduct unbecoming a Union man".

On December 31, 1962, the Foreman was notified by the Union President of the complaint and told that it had been referred to the "Discipline Committee" from which he would hear in due course.

All the events above took place when there was no collective bargaining agreement between the parties.

Thereafter, the plaintiff association and defendant Union made a collective bargaining agreement (the "contract"); this contract is effective from March 31, 1963 to March 31, 1965 and its execution ended the strike.

The plaintiff association is for convenience referred to as the "Employer" and the defendant Union as the "Union".

Section 5 of the contract provides, among other things:

> "The operation, authority, and control of each composing room shall be vested exclusively in the office through its representative, the general foreman, who shall be a member of the Union." [The word "office" undoubtedly means the publisher.]

Section 85 of the contract provides that "any controversy * * * arising under this contract * * * shall be submitted for conciliation" and until final settlement the status quo is to be maintained. "If conciliation fails, then the dispute shall be referred to a board" of four members (two from each side) and if these cannot agree on a fifth member, he is to be designated under the rules of the American Arbitration Association.

In essence, there has been an agreement since March 31, 1963 to arbitrate "any controversy * * * arising under this contract".

After the contract had been made and on June 20, 1963, the Foreman was notified by the Union that the complaint against him would be heard by the Discipline Committee on June 26, 1963.

On June 24, 1963, the Employer filed with the Union President a "grievance", stating that the disciplinary proceedings related to the Foreman's "supervisory duties" and were in violation of Section 5 of the contract. The grievance was stated to be filed under Section 85 of the contract and a prompt meeting with the Union was requested.

No reply from the Union being received, the Employer discussed the situation by telephone with the Union President, who refused to end the disciplinary proceedings and at the same time refused to arbitrate the matter. The Union, however, has not announced any decision as to the Foreman.

As stated in its opposing affidavit and in its opposing memorandum of law, the position of the Union is that it did not agree in the contract to arbitrate this grievance because this grievance arose before there was any contract and because the contract effective March 31, 1963 does not cover events prior to that date.

■ In this action then commenced the Arbitration Act must be put to one side and disregarded. There is no diversity of citizenship here and the United States Arbitration Act can only be invoked if there is some independent ground of federal jurisdiction. Krauss Bros. Lumber Co. v. Louis Bossert & Sons, Inc., 62 F.2d 1004 (2d Cir. 1933); Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402, 408 (2d Cir. 1959). The disagreement between circuits over the question whether collective bargaining agreements in non-transportation industries are excluded from the Arbitration Act as "contracts of employment" (9 U.S.C. § 1) has never been explicitly settled by the Supreme Court. Signal Stat. Corp. v. Local 475, etc., 235 F.2d 298 (2d Cir. 1956). But the announced views of a Supreme Court majority point to Section 301 of the Taft-Hartley Act for enforcement of arbitration clauses in collective bargaining agreements; these views at the same time point away from the Arbitration Act in this connection. Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972

184

(1957); General Electric Co. v. Local 205, etc., 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957). It is also noted that the present action was commenced by the filing of a complaint and the issuance of a summons (which suggests a suit under Section 301 of the Taft-Hartley Act) rather than by petition and notice of application under Section 4 of the Arbitration Act. Cf. Engineers Ass'n. v. Sperry Gyroscope Co. etc., 251 F.2d 133, 135 (2d Cir. 1957).

■ There is no doubt that under Section 301(a) of the Taft-Hartley Act this Court, as a matter of federal substantive law, may and should order the specific performance of an arbitration provision of a collective bargaining agreement to which Section 301(a) is applicable. Textile Workers Union of America v. Lincoln Mills, above.

■ In determining whether to direct arbitration, however, this Court ought not to consider, and has not considered, the merits of the controversy.

■ The sole and only question is "whether the reluctant party [the Union] has breached his promise to arbitrate". United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Put more specifically for this motion: has plaintiff shown a "controversy" which is one "arising under this contract"? If so, the Union has agreed to arbitrate it; if not, there is no such agreement by the Union.

■ It will be seen that the question is not exactly as put by plaintiff, who seeks arbitration of the "grievance" filed by the Association. While the subheading in the contract is "grievance committee", the operative language is "any controversy * * * arising under this contract".

The difficult factor here—not present in the MacNeish case, above—is that the conduct of the Foreman, on account of which the Union proceedings were initiated, took place at a time when the contract was not in existence.

The Employer points out that it was action by the Union during the effective period of the contract—namely, the notice on June 20, 1963 that a Discipline Committee hearing would be held on June 26, 1963—which prompted the filing of the grievance. It is certainly true that if the Union had done nothing about the Foreman after March 31, 1963 there never would have been a controversy. The Employer, therefore, argues that what happened before the existence of the contract is "background facts"; its position is that "the Union may not discipline a foreman during the contract term" because of the "control" of the composing room which Section 5 gives to the publisher.

On the other hand, the Union contends that the "contract does not cover any events prior to the date of its execution on March 31, 1963". Moreover, the grievance filed states that the Union charges arose out of "performance" by the Foreman of his "supervisory duties" and that proceeding with the charges "is a violation of Section 5 of the agreement". This highlights the fact that at the time of the "performance" by the Foreman there was no contract with respect to his "supervisory duties" or otherwise; at that time there was no agreement by the Union giving the publisher "control" of the composing room through the Foreman, who was then simply a Union member subject to its By-Laws and unaffected by any contract with the publisher (because there was no contract).

The Union is in error, however, when it contends that "the agreement was not effective at the time the *grievance* arose" (emphasis supplied) for the "grievance" of the publisher was caused by Union action taken after March 31, 1963.

As often happens, the choice between these conflicting arguments is not entirely clear. There is something to be said on both sides.

In such a situation, the Supreme Court has plainly instructed that the doubt

should be resolved in favor of directing arbitration.

> "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." United Steelworkers of America v. Warrior & Gulf Nav. Co., above, 363 U.S. at pp. 582–583, 80 S.Ct. at pp. 1352–1353, 4 L.Ed.2d 1409.

See also Publishers' Ass'n of New York City v. New York Mailers' Union Number Six, above. This is not a mere technique for reaching a decision where the problem is difficult. On the contrary, it is a studied attempt to give effect to a national labor policy declared by the Congress.

> "The present federal policy is to promote industrial stabilization through the collective bargaining agreement. * * * A major factor in achieving industrial peace is the inclusion of a provision for arbitration of grievances in the collective bargaining agreement.
>
> " * * * In the commercial case, arbitration is the substitute for litigation. Here arbitration is the substitute for industrial strife. Since arbitration of labor disputes has quite different functions from arbitration under an ordinary commercial agreement, the hostility evinced by courts toward arbitration of commercial agreements has no place here. For arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself." United Steelworkers of America v. Warrior & Gulf Nav. Co., above, 363 U.S. at p. 578, 80 S.Ct. at pp. 1350–1351, 4 L.Ed.2d 1409.

Accordingly, an order will be made directing arbitration in the case at bar.

The strictly procedural nature of the present motion is uncertain. It may be a motion for a preliminary and mandatory injunction (cf. Fed.R.Civ.P. 65), or for summary judgment (Fed.R.Civ.P. 56), or for an order analogous to (but not the same as) the order provided for in Section 4 of the Arbitration Act, or it may be (as the notice of motion states) simply for an "order under Section 301 (a)", etc. In any event, the order to be entered hereon would appear to secure for plaintiff all the relief prayed for in the complaint and that a trial of the action is not indicated.

The order should be settled on notice.