The BOEING COMPANY, Appellant,

v.

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, Appellee.

No. 24245.

United States Court of Appeals
Fifth Circuit.

July 24, 1967.

Bernard Marcus, New Orleans, La., Harold Bowron, Jr., Martin, Balch, Bingham, Hawthorne & Williams, Birmingham, Ala., for appellant.

William D. Page, of Page & Williams, Huntsville, Ala., for appellee.

Before BROWN, Chief Judge, SIMPSON, Circuit Judge, and SUTTLE, District Judge.

JOHN R. BROWN, Chief Judge:

In this dynamic field of labor arbitration loosened by the Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, and given such stimulus by the trilogy cases,[1] this case under § 301, 29 U.S.C.A. § 185, adds a new wrinkle, cf. Mike Hooks, Inc. v. Pena, 5 Cir., 1963, 313 F.2d 696, 697, 1963 AMC 355. The issue can be briefly put. Where the disciplinary discharge by the employer takes place during the existence of the new contract which plainly calls for arbitration of discharge cases, is the grievance beyond the scope of the agreement to arbitrate because the activities justifying the disciplinary actions from the employer's point of view occurred prior to the effective date of the contract during the interim between a former expired contract and the new one? The District Court answered in the negative. We agree and affirm.

The facts may also be severely capsulated. Dates are important. On September 15, 1965, the collective bargaining contract between the Employer[2] and the Union[3] expired by its terms. At midnight on that date the Union struck the Employer's installations

---

1. United Steelworkers of America v. American Mfg. Co., 1960, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424.

2. Boeing Company.

3. International Association of Machinists and Aerospace Workers, AFL–CIO.

across the nation, including the one at Huntsville, Alabama, where it was engaged on the Saturn V project for NASA. Despite the strike and active picket line, the Employer continued its operations, some members of the Union continuing to work. On September 16, the four grievants with other striking employees engaged in conduct involving force, violence, intimidation, assaults and threats. On the following day, September 17, the Employer obtained from the Alabama State Court a temporary injunction restraining the Union and these grievants from engaging in such unlawful activity. . On October 2, 1965, a new collective bargaining agreement was reached which was ratified by the Union on October 4, 1965. The striking employees throughout the United States were to, and did, report for work on October 5, 1965. When each of the four grievants reported for work on October 5, he was advised that he had been suspended indefinitely. Following that, on October 13–14, each was advised separately that his employment had been terminated due to his individual misconduct on September 16, 1965, during the interim of no contract and the strike.

Thereafter, the Union filed these grievances with the Employer and sought determination of the grievances under the arbitration provisions of the new contract of October 2, 1965. The Employer rejected arbitration on the ground that the grievances were not subject to the arbitration provisions of the new contract since there was no contract in effect at the time of their misconduct on September 16. Upon opposing motions for summary judgment the District Court entered judgment directing arbitration under the new contract.

The case is a classic one in which the problem under scrutiny becomes complicated from semantics. Thus the Em-

ployer states that it was the grievants' "unlawful conduct which occurred *during the interval* between the labor contracts which is the *basis* for their alleged grievances. It is the time of such misconduct, therefore, which is the critical time for determining the respective rights of the parties." Again it says the question presented is " * * * whether or not [the Employer] and the Union have agreed to arbitrate a dispute which is *based* upon *acts occurring* while there was no labor contract in effect. * * *." And discussing specifically *Proctor & Gamble* [4] with which we deal later, it asserts the rationale of that decision is " * * * that the critical time for measuring an employer's duty to arbitrate is at the time of commission of the acts made the basis of a grievance." [5] Thus, in a variety of ways, the Employer's basic position is that the subject matter of the grievance is the conduct of the employees on September 16 during the time of no contract and the strike. In contrast, it is " * * * the contention of the Union that the grievance did not *arise* until the date of the suspensions and discharges, and that on that date there was a collective bargaining agreement in full force and effect." [6] (Emphasis in the original). The key, therefore, is determining what is the grievance, not the validity of the reasons which led the party to take the action complained of.

The failure of the Employer to keep this distinction carefully in mind accounts for several contentions which are not really in the case. The first of these is the assertion that *Warrior & Gulf* (see note 1, *supra)* and *Atkinson* [7] make clear that it is for the courts to determine whether the reluctant party has breached his promise to arbitrate since he may not be compelled to submit to arbitration any dispute which he has not

4. Proctor & Gamble Indep. Union, etc. v. Proctor & Gamble Mfg. Co., 2 Cir., 1962, 312 F.2d 181.

5. These quotations come from the Employer's brief, pages 8, 11, and 12. Some of the emphasized portions have been added.

6. Union's br. p. 7.

7. Atkinson v. Sinclair Ref. Co., 1962, 370 U.S. 238, 242, 82 S.Ct. 1318, 8 L.Ed.2d 462.

agreed to submit.[8] One thing is crystal clear under the new contract. If—and the if is really the heart of the question—the grievance is the suspension and discharge subsequent to the effective date of the new contract, not the Employer's reasons therefor based upon the conduct of September 16, the new contract explicitly calls for grievance machinery and arbitration of lay-offs and discharges.[9]

---

8. Following the admonition of *Warrior & Gulf*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409, that "judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made * * *," we have many times resisted the importunities of the reluctant party to pass on the underlying merits in the guise of determining this limited issue. See, e. g., United Steelworkers, etc. v. American International Aluminum Corp., 5 Cir., 1964, 334 F.2d 147, 151; International Ass'n of Machinists v. Hayes Corp., 5 Cir., 1961, 296 F.2d 238, 242, rehearing denied, 1963, 316 F.2d 90; Local Union No. 787, International Union of Electrical Workers, etc. v. Collins Radio Co., 5 Cir., 1963, 317 F.2d 214, 216; Sinclair Ref. Co. v. NLRB, 5 Cir., 1962, 306 F.2d 569, 570; Taft Broadcasting Co. v. Radio Broadcast Technicians Local Union No. 253, 5 Cir., 1962, 298 F.2d 707, 709; Lodge No. 12, etc. v. Cameron Iron Works, Inc., 5 Cir., 1961, 292 F.2d 112, 117–118.

9. <u>"ARTICLE XII.</u>

"<u>DETERMINATION OF DISPUTES.</u>

"Section A. Settlement of Complaints, Grievances and Differences.

"Grievances or complaints arising between the Company and its employees subject to this Agreement, or the Company and the Union with respect to the interpretation or application of any of the terms of this Agreement, shall be settled according to the following procedure. Subject to paragraph 1.h. [dismissal or suspension for cause] of this Article, only matters dealing with the interpretation or application of terms of this Agreement shall be subject to this grievance machinery.

"1. * * * [Subparagraphs a, b, c, d, and e prescribed shop negotiations, notice, etc., up through successive levels of Union-Employer discussions leading to arbitration]

"g. In cases of layoff the employee shall be given a copy of the layoff slip, and he shall have the right to appeal such layoff in accordance with the foregoing grievance procedure, * * *. The written grievance then shall be processed through subsequent steps if necessary.

"h. In cases of dismissal or suspension for cause or of involuntary resignation, the employee shall be given a copy of the Termination of Service slip which will show the reason for such termination, and he shall have the right to appeal such termination in accordance with the foregoing grievance procedure * * *. The written grievance then shall be processed through subsequent steps if necessary. If settlement is not effected prior to arbitration and the matter is appealed to an Arbiter in accordance with subparagraph e. hereof, the Arbiter shall have the discretionary power to decide such appeal on the basis of any information that he deems pertinent which is presented to him at the hearing.

"2. In the case of any grievance which the Union may have against the Company or the Company may have against the Union, such grievance is hereby limited to matters dealing with the interpretation or application of terms of this Agreement, and shall be handled as follows:

"a. [Steps outlined] * * *.

"b. If no settlement is effected * * * either party may in writing request that the matter be submitted to an Arbiter * * *. If no settlement is effected within [prescribed time] * * * arbitration may proceed unless request therefor is withdrawn.

"c. All decisions arrived at under the provisions of this Article XII by * * * the Arbiter, shall be final and binding upon both parties, provided, however, that in arriving at such decisions neither the parties nor the Arbiter shall have the authority to alter this Agreement in whole or in part."

So too, is it clear both from the facts and the candid statements made on argument, that the Employer's refusal to allow the men to return to their jobs as they reported for work on October 5 amounted to a lay-off and suspension, and that this was followed by a permanent termination some ten days later. This is borne out by the formal notices of termination which reflected the Employer's understanding that until suspended, terminated, or both, the four grievants were employees eligible for work under the new contract.[10]

It is equally plain that with respect to employment as distinguished from obtaining the State Court injunction, the first and only action taken by the Employer occurred during the pendency of the new contract.

What hurt was the loss of the right to return to work when the plants reopened after the strike. This hurt was made permanent when the suspension of October 5 was transmuted into a permanent termination and discharge a week later. The grievance was action of the Employer in terminating the contractual right to present and future employment. It was these actions by the Employer after the new contract became effective that for the first time had any adverse effect upon the four employees. This was the action complained of, not the reasons given by the Employer for the disciplinary discharge.

It is this which distinguishes *Proctor & Gamble*, (note 4, supra) upon which the Employer places such heavy reliance. For there the disciplinary action imposed by the employer on the grieving employees was taken during the interim between the expiration of one contract and the execution of the new contract. Likewise, the grievance was filed by the union during that same interim. The Second Circuit held this controversy was not subject to arbitration. Although the Second Circuit spoke in terms of the coincidence of [1] the activities on which the discipline was based, [2] the time the disciplinary measures under review were taken and [3] the filing of the grievances all during the interim between contracts,[11] for our purposes the critical fact was [2] and possibly the conjunction of [2] and [3].

And, contrary to the Employer's contention that these cases point to denial of arbitration, the refusal of arbitration in International Brotherhood of Electrical Workers, Local Union No. 1102 v. Wadsworth Electric Mfg., E.D.Ky., 1965, 240 F.Supp. 292, and Food Handlers

---

10. The contract was effective three days prior to October 5. Article XVI—Duration: "This Agreement shall become effective October 2, 1965 (which date is the date as of which this Agreement was executed, sometimes referred to as the 'effective date of this Agreement') and shall remain in full force and effect until midnight at the close of October 1, 1968.". On its face it reached back to pick up those who were the Employer's "employees" prior to the strike. See, e. g. the initial "whereas" clause "relating to employees of the Company represented by the Union and more particularly described in this Agreement * * *," the express recognition of the Union as the bargaining agent "for all employees" (Art. I Sec. A), and the detailed protective provisions for "old" employees, see, e. g. "Article VI, Seniority, Section A, subparagraph 1: "The seniority of an individual at any time shall be the amount of seniority as of the day preceding August 11, 1960 and accumulated during the period prior to that date in accordance with paragraph 2 of this Section plus the amount of seniority accumulated by him on and after that date in accordance with paragraph 3 of this Section, subject to the conditions and limitations of this Article." This would be lost by a discharge for cause. See Art. VI Sec. B.

11. For ease in identification we have inserted the brackets [1], [2], in the Court's statement. The Court stated: "Thus [1] the activities on which the discipline was based, [2] the disciplinary measures the propriety of which the union seeks to arbitrate, and [3] the filing of the grievances all occurred in the interval between the termination date of the old agreement and the effective date of the new agreement." 312 F.2d 181, 183.

Local No. 425, etc. v. Arkansas Poultry Coop., Inc., W.D.Ark., 1961, 199 F.Supp. 895, merely reflects the significant principles at work. In each, at the time of the employees' discharge which occurred after the expiration of the contract, there was no contract in existence. Illustrating the neutral character of these principles so that it is sauce for both employer and union alike is Pock v. New York Typographical Union No. 6, S.D.N.Y., 1963, 223 F.Supp. 181. There the dispute, that is the grievance, was the employer's claim that the union had no authority to discipline a foreman who was a member of the union for his conduct during a strike.

And from the vantage of this suborbital oracle we can discern no aid or comfort to the Employer's cause in the cryptic and sometime unrevealing per curiam of the Court in Piano & Musical Instrument Workers Union Local No. 2549 v. W. W. Kimball Co., 1964, 379 U.S. 357, 85 S.Ct. 441, 13 L.Ed.2d 541.[12]

The employer insists that since the Court in reversal summarily ordered arbitration of the Union's claim of the right to a preferential hiring at a time subsequent to the expiration of the collective bargaining agreement, the Court necessarily must have adopted the concept that it is the time of the actions out of which the dispute arose, not the time of the challenged action by the employer, which is controlling. Pursuing that approach, the instant controversy would not be arbitrable since it was the alleged violent activities of the four employees on September 16 which led to the Employer's dissatisfaction and the subsequent decision to suspend and discharge them.

Analysis of the case, especially in the light of the details revealed in the opinion of the Court of Appeals,[13] will not support this reading. During a one-year contract expiring October 1, 1961, the employer, based upon a nondiscriminatory decision to close the plant in the Chicago suburbs and move all operations to a new plant at French Lick, Indiana, laid off 38 employees. The union contract provided for seniority rights for a period of two years following lay-off. Re-employment was to be in the order of seniority. The contract had a detailed grievance machinery culminating in arbitration. Prior to the expiration of the contract, the union demanded re-employment for all of the lay-offs at the proposed new location. These negotiating efforts were fruitless. But not until October 9, 1961, eight days after the expiration of the contract did the employer hire its first worker at French Lick. Negotiations, all unsuccessful from the union's standpoint, continued and finally in July of 1962 arbitration was demanded followed by the suit under § 301, 29 U.S.C.A. § 185, filed in September 1962.

There was, thus, action taken by the employer during the existence of the contract which was detrimental to the interest of the employees, namely, a lay-off which under the circumstances was going to be permanent. Likewise, arbitration was demanded during the currency of the contract. This gave rise to a "substantive" question of whether the lay-off and seniority re-employment rights afforded any relief to the 38 men laid off. This in turn was further divided into the time periods of (a) the remaining unexpired term of the contract down to October 1, 1961, and (b) the time thereafter, if any, subsequent to the expiration date.

As we read the Seventh Circuit's opinion—and, we believe, as the Supreme

---

12. "The petition for writ of certiorari is granted and the judgment is reversed. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403, and John Wiley & Sons,

Inc. v. Livingston, 376 U.S. 543, 84 S. Ct. 909, 11 L.Ed.2d 898."

13. Piano & Musical Instrument Workers Union Local No. 2549 v. W. W. Kimball Co., 7 Cir., 1964, 333 F.2d 761.

Court read it,—that Court undertook to answer both questions as a matter of judge made, judge understood, judge pronounced, contract law. After a lengthly discussion of *Wiley*,[14] the Court emphasized repeatedly the drastic nature of the move from Chicago to French Lick and the failure of the union to supply a list of names of those who would be willing to make the move. In answering the post-expiration phase the Court emphasized that the hirings at French Lick all took place after the expiration of the contract. Since it presumably thought the seniority rights to re-employment on lay-off were effective only during the term of the contract, no "difference", as the Court put it, arose during the term.[15] The effect of the Court's action was to conclude as a matter of contract law that the bargaining agreement did not extend seniority re-employment rights subsequent to the expiration date.

And yet it was the analogous rights to "post-merger" seniority rights asserted by the union in *Wiley* which the Court held were for the arbiters' decision.[16]

From the Court's parallel citation to *American Mfg.* (see note 12, supra) it seems clear that the Supreme Court regarded the action of the Seventh Circuit as an impermissible effort to decide "substantive" issues which under the new *Lincoln Mills* dispensation are now for the arbiter, at least in the first instance. Whether post-expiration seniority lay-off, seniority re-hiring rights for lay-offs occurring during the terms were available depended on a construction of the contract and this was for the arbiter. The reversal cannot therefore be read as the Supreme Court's imprimatur upon the notion that it is the time of the activities—there the decision to close one plant and move to another followed by lay-offs, here the violence of September 16—which determines arbitrability.

Employees presumably covered by the contract were laid off and then discharged during the existence of the contract. That dispute the Employer had bound itself to arbitrate. The trial Court was correct in compelling this plain obligation.

Affirmed.

14. John Wiley & Sons, Inc. v. Livingston, 1964, 376 U.S. 543, 84 S.Ct. 909, 11 L. Ed.2d 898.

15. "We hold that the record fails to show that defendant during the term of the agreement in any way violated the seniority rights of any of its employees as to employment at French Lick. We further hold that, during the term of the agreement, there was never any *difference* between the parties to this case in regard to seniority rights as to employment at French Lick, and that therefore there was no difference which became a proper subject for arbitration." (Emphasis by the Court.) 333 F.2d at 765.

16. "It is true that the Union has framed its issues to claim rights not only 'now'—after the merger but during the term of the agreement—but also after the agreement expired by its terms. Claimed rights during the term of the agreement, at least, are unquestionably within the arbitration clause; * * *. As to claimed rights [after the merger] it is reasonable to read the claims as based solely on the Union's construction of the [pre-merger-employer] agreement in such a way that, had there been no merger, [the employer] would have been required to discharge certain obligations notwithstanding the expiration of the agreement. We see no reason why parties could not if they so chose agree to the accrual of rights during the term of the agreement and their realization after the agreement had expired. * * * Whether or not the Union's demands have merit will be determined by the arbiter in light of the fully developed facts. It is sufficient for present purposes that the demands are not plainly unreasonable that the subject matter of the dispute must be regarded as nonarbitrable because it can be seen in advance that no award to the Union could receive judicial sanction. * * *." 376 U.S. 543, 554–555, 84 S.Ct. 909, 917.