**UNITED STATES GYPSUM COMPANY, Appellant,**

v.

**UNITED STEELWORKERS OF AMERICA, AFL–CIO, Appellee.**

No. 23918.

United States Court of Appeals
Fifth Circuit.

Sept. 21, 1967.

Certiorari Denied Jan. 15, 1968.

See 88 S.Ct. 783.

John J. Coleman, Jr., T. W. Thagard, Jr., Birmingham, Ala., Harold D. Burgess, Charles B. Mahin, Chicago, Ill., Douglas Arant, Birmingham, Ala., for appellant, Bradley, Arant, Rose & White, Birmingham, Ala., and Spray, Price, Hough & Cushman, Chicago, Ill., of counsel.

Jerome A. Cooper, Birmingham, Ala., Michael Gottesman, Washington, D. C., Bernard Kleiman, Gen. Counsel, Pittsburgh, Pa., for appellee, Bredhoff & Gottesman, Washington, D. C., and Coop-

er, Mitch & Crawford, Birmingham, Ala., of counsel.

Before BROWN, Chief Judge, SIMPSON, Circuit Judge, and SUTTLE, District Judge.

JOHN R. BROWN, Chief Judge:

The basic question in this case is whether the purchaser of assets of the predecessor employer can be compelled to arbitrate grievances under the collective bargaining contract between the employer and the union certified as the bargaining representative. Subsidiary, but perhaps more vexing, questions concern the Union's right to assert the grievance, demand arbitration or secure arbitral relief with respect to post-expiration periods, and both substantively and in point of time, with respect to post-decertification periods. In a § 301, 29 U.S.C.A. § 185, suit the District Court ordered arbitration. The Successor-purchaser appeals. We affirm.

The facts are neither complex nor conflicting. On April 1, 1965, the Successor [1] purchased all property and assets of the Employer [2] at its lime plant in Montevallo, Alabama, not including cash and accounts receivable. The sales purchase agreement undertook to exclude from the purchase the bargaining contract between Employer and Union. [3]

This collective bargaining contract was for a term of three years, expiring March 30, 1967, two years subsequent to the asset acquisition by The Successor. The Union was not, of course, a party to the purchase contract. Indeed, actions of the Employer and The Successor reflected their judgment that the interest of the employees and the Union was none of their concern. [4] As though for all purposes—and certainly for labor relations—the enterprise was completely new and divorced from the prior operations, the Successor processed applications for employment and on April 5 hired all of Employer's former employees (note 4 supra) except three. Except that the Successor did not check off union dues, determined seniority as of the date of employment with it, and by agreement installed a health insurance plan, the terms of employment were substantially the same as before the purchase. So too, was the physical operation—same work force, same plant, same process, same product (except for trade name), under the same supervisors.

In May, 1965, the Union, expressing "the desire * * * promptly to resolve the dispute about our contract, * * * so that the parties may continue to enjoy the collective bargaining relationship" existing since 1958, pursued the contract procedure including arbitration for settlement of grievances. [5] The Successor, refusing to arbitrate, commenced action before the National Labor Relations Board. After a few set backs, this ended

1. United States Gypsum Company. We use this as a handy shorthand descriptive, not as a prejudgment of the legal issue.

2. United Cement Company, Inc.

3. United Steelworkers of America, AFL-CIO, Local Union No. 5674, and United Steelworkers of Ameirca, AFL-CIO.

4. The Employer on March 19 and 22 notified its employees of the impending purchase and the opportunity to apply to The Successor for new employment. On March 28, prior to consummation, the Employer formally terminated all employees.

5. The "Grievance Report" dated May 17, 1965, reads:
   "1. The Company refuses to recognize and comply with the contract executed on March 30, 1964.

   "2. The Company has filed vacancies such as burner helper without complying with Article VIII of the contract.

   "3. The Company has failed and refused to deduct union dues in accordance with Article VI of the contract.

   "4. The Company has refused to recognize seniority as established in Article VIII of the contract.

   "5. The Company has announced that it is not bound by said contract.

   "6. The Company has refused to recognize or deal with the duly authorized officers and representatives of the Union."

successfully in a formal decertification of the Union.[6]

The Successor attacks the decree on a number of fronts. First, it denies that the predecessor contract is binding on it. Second, even if it is, then the contract cannot impose obligations as to the future, or in any event after decertification. And, third, whatever the decision on first and second, none of these grievances (note 5 supra) is substantively arbitrable.

I

When all is said and done the Successor's attack on the binding force of the contract is a frontal, massive assault on *Wiley*.[7] For while a diversionary thrust is made on the factual distinction that this is an asset acquisition, not a consensual merger, the Successor cannot escape from the Court's expressed unwillingness to cast its decision in terms of title, property or corporate niceties.

"This Court has in the past recognized the central role of arbitration in effectuating national labor policy. * * * It would derogate from 'the federal policy of settling labor disputes by arbitration' * * * if a change in the corporate structure or ownership of a business enterprise had the automatic consequence of removing a duty to arbitrate previously established; this is so as much in cases like the present, where the contracting employer disappears into another by merger, as in those in which one owner replaces another but the business entity remains the same." 376 U.S. at 549, 84

S.Ct. at 914. The important thing to the Court was the "substantial continuity of identity in the business enterprise before and after a change", 376 U.S. 543, 551, 84 S.Ct. 909, 915. The Court very frankly recognized that it was not dealing with traditional notions of contract law, assumption by successors, or the like.

"The preference of national labor policy for arbitration as a substitute for tests of strength between contending forces could be overcome only if other considerations compellingly so demanded. We find none. While the principles of law governing ordinary contracts would not bind to a contract an unconsenting successor to a contracting party, a collective bargaining agreement is not an ordinary contract. * * * Therefore, although the duty to arbitrate * * * must be founded on a contract, the impressive policy considerations favoring arbitration are not wholly overborne by the fact that *Wiley* did not sign the contract being construed." 376 U.S. at 550, 84 S.Ct. at 914. This is, of course, entirely in keeping with the trilogy[8] opinions which cast the problem in terms of effective labor relations using the collective bargaining-compact as a sort of "common law" of the shop, Warrior & Gulf, supra, 363 U.S. 574, 578–579, 80 S. Ct. 1347, not a bond to be read and applied by judges under the usual contract principles.

The Successor's complaint is the bald one that *Wiley* and those cases specifical-

6. The Board's decision ordering election is dated October 28, 1966, subsequent to the May 27, 1966, judgment below. United States Gypsum Co. Case No. 10–RM–441, 161 NLRB No. 61. The decertification is dated December 2, 1966. The Board had earlier declined to accept The Successor's representation petition. United States Gypsum Co., March 11, 1966, 157 NLRB No. 60.

We deal specifically with this in part III, infra.

7. John Wiley & Sons, Inc. v. Livingston, 1964, 376 U.S. 543, 84 S.Ct. 909, 11 L. Ed.2d 898.

8. United Steelworkers of America v. American Mfg. Co., 1960, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424, which followed on the icebreaker, Textile Union Workers of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed. 2d 972.

ly applying it to asset acquisitions [9] are simply wrong.

We may grant that the assault is well constructed and formidable, resting primarily on the assertion that from deficiencies in advocacy, the Court was either led or pushed into error. The main thread has two strands. The first is that *Wiley* failed to reckon with the deeply ingrained, deliberate Congressional policy against compulsory arbitration which is brought forward as a part of the LMRA.[10] The second is that through ineptness of the adversaries or self interest of the successor the Court had pressed on it the "continuity of identity" [11] test

presumably in the hopes that factually the Court would find it not to have been satisfied. Out of self interest of a litigant this was to introduce a beguiling, though erroneous, concept. This, the argument runs, is so because it fails to reckon with the distinction between a successor employer's (a) duty to recognize and bargain with the collective bargaining representative of the predecessor employer,[12] and (b) the scope of such successors obligation actually to reach a contract.[13] Apparently this leads the Successor to conclude that while it had (until decertification) the (a) duty to recognize and bargain in good faith, it had no

9. United Steelworkers of America v. Reliance Universal Inc., 3 Cir., 1964, 335 F. 2d 891; Wackenhut Corp. v. International Union, United Plant Guard Workers, 9 Cir., 1964, 332 F.2d 954; Monroe Sander Corp. v. Livingston, S.D.N.Y. 1966, 262 F.Supp. 129; cf. McGuire v. Humble Oil & Ref. Co., 2 Cir., 1966, 355 F.2d 352.

10. The Successor refers to the rejections of binding arbitration in the formulative process of the Taft Hartley Act. See S.Rep. 105, 80th Cong., 1st Sess., Part 2, p. 1 (April 22, 1947); p. 28 (April 17, 1947); H.Rep. 510, 80th Cong., 1st Sess. pp. 35, 62–63 (June 3, 1947); pp. 100–102 (April 11, 1947); also NLRB v. American National Ins. Co., 1952, 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027.

"The National Labor Relations Act is designed to promote industrial peace by encouraging the making of voluntary agreements governing relations between unions and employers. The Act does not compel any agreement whatsoever between employees and employers." 343 U.S. 401–402, 72 S.Ct. 828.

11. The Successor urges that in *recognition*, i.e. representation cases, the Board has used this test. See, e.g., Johnson Ready-Mix, 142 NLRB 437, 442 (1963); Alamo White Truck Service, 122 NLRB 1174 (1959), reversed, NLRB v. Alamo White Truck Service, Inc., 5 Cir., 1959, 273 F.2d 238; Krantz Wire, 97 NLRB 971 (1952), enforced sub nom. NLRB v. Armato, 7 Cir., 1952, 199 F.2d 800, 803.

12. Section 8(a)(5) of the Act, 29 U.S. C.A. § 158(a)(5) makes it an unfair labor practice for an employer:

"(5) to refuse to bargain collectively with the representatives of his employees,

subject to the provisions of section 9 (a)."

Section 9(a) of the Act, 29 U.S.C.A. § 159(a), making it clear that only the employees count on the question of recognition, states:

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment * * *."

13. Section 8(d) of the Act, 29 U.S.C.A. § 158(d), makes it clear that the duty to bargain does not necessarily compel agreement:

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession; * * *."

See also S.Rep. 574, 74th Cong., 1st Sess., p. 12 (1935); NLRB v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, 916; NL RB v. American National Ins. Co., supra, 343 U.S. at 405, 408–409, 72 S.Ct. 824.

duty to (b) conclude an agreement and since it could not be compelled to reach an agreement, it could not be forced to accept an agreement made by others.

■ We may grant also that the Court may, and sometimes does, repudiate even its very recent holdings [14] and that under extraordinary circumstances a lower Federal Court may or should do so in advance.[15] But without the slightest whisper of a possible suggestion that the Supreme Court ought to take such action under the importunities of these arguments, we find it enough to say that it is for the Supreme Court, perhaps in this very case, not us, to so declare.

■ The Trial Court was correct in holding that the predecessor contract bound the Successor to arbitrate claims under it.

## II

■ Despite this holding the Successor maintains several additional contentions. One is that the arbitration cannot reach matters which occur subsequent to the acquisition of assets.

This argument is based essentially on the notion that *Wiley* dealt only with *vested* rights. But to talk in such terms is to introduce a new controversy, not solve the present one. For the critical thing is what is meant by "vested." The rights must, of course, be "vested" in the sense that the contract during its effective term accorded the rights. But it is a mistake to assume that they must have so far ripened into a grievance that

they then represented a present claim for present relief. For as we have recently pointed out in *Boeing*,[16] the subsequent reversal in *Kimball Piano*[17] revealed clearly the Court's holding that arbiters could determine as a matter of contract law that it is entirely possible for a collective bargaining contract to accord rights and benefits which will come into play and be subject to appropriate enforcement—by arbitration or court action—even after the expiration of the contract.

## III

■■ Now we face the more difficult problem of decertification. In the ordinary course of events, a collective bargaining agreement entered into by the union and the employer will be binding on the employer, or his successor, until it expires. The Successor urges, however, that the formal decertification of the Union (see note 6 supra)[18] obliterated any obligation on the part of the Successor to recognize the Union or to submit the grievances asserted by the Union under the contract to arbitration. This contention rests upon the bald assertion that the Union, subsequent to its decertification, has no right to enforce the agreement or any of its provisions.[19] We reject this broad claim.

In the present context, the issue thus presented raises these kinds of problems. The primary inquiry relates to the availability of substantive rights accorded to the employees under the contract. But

---

14. Swift & Co., Inc., v. Wickham, 1965, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194, overruling Kesler v. Dep't of Public Safety, 1962, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641.

15. Bass v. State of Mississippi, 5 Cir., 1967, 381 F.2d 692; Browder v. Gayle, D.C.Ala. (3 Judge), 1956, 142 F.Supp. 707, 716 & n. 14.

16. Boeing Co. v. International Ass'n of Machinists, 5 Cir., 1967, 381 F.2d 119, nn. 12–14 and accompanying text.

17. Piano & Musical Instrument Workers Union, Local 2549 v. W. W. Kimball Co., 7 Cir., 1964, 333 F.2d 761, reversed per

curiam, 379 U.S. 357, 85 S.Ct. 441, 13 L. Ed.2d 541.

18. The decertification occurred on December 2, 1966, during the term of the contract, which was not to expire until March 30, 1967.

19. The Successor cites Retail Clerks Intern. Ass'n v. Montgomery Ward & Co., 7 Cir., 1963, 316 F.2d 754; Glendale Mfg. Co. v. Local No. 520, International Ladies' Garment Workers' Union, 4 Cir., 1960, 283 F.2d 936. These cases antedated the Supreme Court's holding in *Wiley* and did not therefore take into consideration the problems, hereinafter discussed, that *Wiley* raised.

these rights are of four main classes. There will be (a) those which become effective during the term of the contract, (b) those coming into effect after the expiration of the contract (see part II supra), and (c) after decertification of the union, or (d) after both (b) and (c). A distinction must also be drawn between this substantive inquiry and the related problem of who has the right (or duty) to champion such substantive rights. Specifically, we are here concerned with the right of the Union which has since been decertified to assert grievances on behalf of the employees (1) up to its decertification and (2) after its decertification.

In the Congressional scheme for collective bargaining, the recognized union representative has not only the right but the duty to act on behalf of all members of the class.[20]

It must be borne in mind that what we are talking about relates only to the right of the Union to act as the champion for the employees to assert their substantive rights under the contract. The duration in time of the substantive rights themselves is not affected by decertification. Decertification cannot ordinarily extinguish substantive rights. But it might have a powerful effect on whether the union can champion those rights. This problem essentially comes down to the judge-made balancing of competing factors.

On the one hand is the reflex to the statutory duty to deal only with the representative chosen by the majority. The duty to deal is strong. But no less stringent is the duty not to deal with one having only minority support.[21] But to take the easy, almost mechanical, doctrinaire approach that loss of majority status extinguishes the union's power (duty) to act ignores other vital interests—indeed, interests which need protection and which will be lost unless an ardent advocate of them is available.

Here we speak of the employees in terms of their bread and butter personal interest in "rates of pay, wages, hours of employment, or other conditions of employment" § 9(a), 29 U.S.C.A. § 159(a) and see § 2(5), 29 U.S.C.A. § 152(5), embodied in the contract.

It is one thing for an employee or a group of employees to have rights giving rise to benefits which are immediately due. It may be quite another thing to make them effectual. Here the disparity in economic strength and resources is sharply revealed. Here the worker needs an advocate able to match these opposing strengths. To leave the individual worker to his own devices and resources in the name of legislation designed to equalize positions is to ignore the rich history of labor-management relations and to frustrate a primary aim of such legislation. Industrial strife—and its opposite industrial peace—can come from big issues. But frequently it comes from small, occasionally almost petty, controversies. Nationwide activity can grind to a halt over the question of who is to

**20.** This comprehensive notion received early, spectacular development under the Railway Labor Act 45 U.S.C.A. § 151 et seq. which imposes upon the union as the exclusive bargaining representative of a craft or a class of Railway employees the duty to represent all members without discrimination. Steele v. Louisville & Nashville R.R. Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 1944, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187; Graham v. Brotherhood of Locomotive Firemen and Enginemen, 1949, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22. Under § 9(a), of the LMRA

29 U.S.C.A. § 159(a), it is a statutory mandate.

"(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment * * *."

**21.** Indeed it may be an unfair labor practice to do so. International Ladies' Garment Workers' Union v. NLRB, 1961, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762.

throw a switch. Problems which to the outsider seem petty are thought by the adversaries to be matters of great principle, if not principal.

Whether these differences arise in the formative process of bargaining leading up to the contract, or that continuous bargaining duty in the performance of such contract, the employees need a champion having an ardent interest and ample resources. Since the union has presumably obtained the disputed "right" in the first instance by getting it in the contract, there does not seem to be any reason why it should not be the champion of that right when the controversy comes alive, certainly not where there is then no competing union claiming to be the contemporary bargaining representative.[22]

■■■ This result obviously is called for as to those substantive rights which arise under the contract and ripen into some relief which becomes operative prior to decertification. Such grievances (see note 5 supra) are ones which arose under the contract and for breach of which effective relief was available prior to decertification.[23] With respect to grievances relief for which is operative up to the time of decertification the Union clearly has the right to assert them.

With respect to those substantive rights arising out of the contract but which ripen into relief which becomes operative subsequent to decertification of the Union, additional factors arise. One, of course, is the substantive right to future benefits. But existence and validity of the substantive right itself would be, initially at least, a question for the arbitrator. This in turn depends on which rights by their very nature have viability beyond the expiration of the contract. Classic among those rights which may arise under the contract yet not ripen into effective relief until many years after the contract has expired is the right of seniority, or rights under a welfare or pension plan. On the other hand, some rights expire by their own terms with the contract. Again, this will be a question for the determination of the arbitrator. We emphasize this as it serves to illustrate the fallacy of using such terms as "accrued" or "vested" to describe the nature of the substantive rights of employees under a collective bargaining agreement. These terms merely compound the problem without contributing to its solution.

Another, and more important factor, is the element of time. If the Union responsible for "negotiating" or "consummating" the contract has the right (duty) as to post-decertification relief it is quite possible that such matters might not arise until years later. This poses practical and substantial problems not easy of solution. It might even, for example, permit a union long since rejected to come into a plant, demand the right of inspection, the production of records, etc., to determine whether as to some of its former members the "old" contract is being fulfilled. On the other hand if that "old" union does not have the right (duty), the long-time employee may lose value, then enforceable rights growing out of the "old" contract. Just as with other disputes such employee needs a champion.[24]

What we have briefly outlined makes it wise that we refrain from a determination of this aspect except to hold that such claims may be the subject for the arbitration now ordered. The arbiters may never make an award as to them. We should wait until enforcement proceedings or the issue is otherwise inescapably presented.

■■■ Having determined the Union's right to assert the grievances here in question, we need not pass on the merits of the Union's attack on the Board ordered election and resulting decertifi-

22. No rival union claims to represent the Successor's employees.

23. The substantive nature of these grievances as well as the role of the arbitrator is treated in detail in part IV infra.

24. Indeed he might need the "old" union as his advocate even if another union was then certified if the "right" in dispute was wrapped up in antagonistic union policy.

cation. At the outset, it recogizes that this representation action of the Board is not reviewable as such, but asserting that there ought to be at least an equality with an employer's right to contest an RC order through a § 8(a) (5) proceeding, it asks that we do so here.

The Union contends that this election, occurring during the term of a three-year contract and at a time when the Union was actively asserting the rights of its members, flies in the teeth of the Board's own contract bar rules.[25] The Union charges that in contravention of the Board's own rules, the Board here ordered an election which resulted in the loss by the Union of its certified status during the contract term. The Union asserts that there is an added reason to hold the Board's act invalid since the loss of majority status was primarily the result of the Successor's failure to recognize the Union as the bargaining agent of the employees, or to comply with its obligations under the contract. This, it contends violates the holdings of this court. "In a case concerning a successor employer, principles of fair play require that we look to the time of the succession to determine if the Union represents a majority of the employees. The employer is not without remedy. The employer's proper course is to [1] recognize the prima facie union representation of the employees and [2] to continue to deal with the union, but [3] to petition the Board for a new election."[26] NLRB v. Auto Ventshade, Inc., 5 Cir., 1960, 276 F. 2d 303, 307. Since in this case, the Successor gave no recognition to the Union, to allow the Successor now to avoid its

contractual obligations which ripened into effective relief prior to the Union's decertification would, it urges, only encourage purposeful delay on the part of employers in derogation of the stable relationship an avoidance of industrial strife sought to be achieved by the Act.

But this record which contains nothing that was before the Board in its undulating decisions [27] (see note 6 supra) gives us no sure basis for declaring its actions invalid assuming—a big assumption—that we have the power. But these factors do go a long way toward supporting our basic decision that compelling this limited post-decertification recognition by the employer of the repudiated representative is consistent with the policies sought to be achieved by the Act. The Second Circuit, in NLRB v. Warrensburg Board & Paper Corp., 2 Cir., 1965, 340 F.2d 920, was faced with the question whether an employer could be required by the Board to enter into a contract with a duly certified union when the contract, if it had been properly signed, would have expired prior to the Board's enforcement order, where the employer had granted the benefits sought by the Union, and where the Union had lost its majority status. In upholding the Board's order, the Court noted that "[w]ere we merely to weigh the respective equities of the parties we might be inclined to deny enforcement of the Board's orders or, alternatively, to require that the Board conduct another representation election. There are arguments against subjecting the large majority of the employees to the leadership of the union which they have repudiated

---

**25.** The statute provides only that "[n]o elections shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held." 29 U.S.C.A. § 159(c) (3). Under the Board policies, however, "contracts for definite duration for terms up to three years will bar an election for their entire period; contracts having longer fixed terms will be treated for bar purposes as three-year agreements and will preclude an election for only their initial three years." General Cable Corp., 139

NLRB 1123, 1125 (1962). "Agreements of longer duration, as a majority of the Board has recently held, will, however, bar for their entire term an election sought by the contracting employer or the contracting certified union." Id. at 1125 n. 7.

**26.** Numbers in brackets [1], [2] etc., inserted for emphasis.

**27.** To these must be added the unsuccessful efforts of the Union to get the General Counsel to accept unfair labor practice charges against The Successor.

and to the terms of a two-year contract which by this time would have expired. It would do violence to the Act, however, so to hold, for failure to enforce would encourage purposeful delay in other cases." 340 F.2d at 923. See also Brooks v. United States, 1954, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125.

We hold, therefore, that the Union has the right to assert these grievances and that the Successor must submit them to arbitration under the contract.

## IV

Finally the Successor asserts that notwithstanding our holding that it is bound by the agreement to arbitrate, none of these grievances (note 5 supra) present substantively arbitral issues.

### Contract Assumption [28]

█ In claiming that the contract could not be interpreted to apply in the future—i. e., subsequent to the asset acquisition—this argument of the Successor is essentially a rehash of the reasons found wanting in Part I and that portion of the arguments discussed in Part III resting upon the asserted duty of an employer to discontinue recognition of a Union once it has been repudiated by the employees.

### The Recognition Provision [29]

The Union seeks by this claim to impose upon the Successor the contract obligation [30] to recognize the Union as the employee's representative. As such it is, of course, closely aligned with grievances 1 and 5 just discussed.

The argument here is four fold. First, Wiley, did "not suggest any view on the question surrounding a certified union's claim to continued representative status following a change in ownership." 376 U.S. 543, 551, 84 S.Ct. 909, 915.

Second, having been decertified it has lost its representation status "[a]ny right to recognition as bargaining agent which (the Union) secured by virtue of (its contract) ceased and became inoperative on decertification" Retail Clerks International Ass'n v. Montgomery Ward & Co., 7 Cir., 1963, 316 F.2d 754, 757; Glendale Mfg. Co. v. Local No. 520, Internat'l Ladies' Garment Workers' Union, 4 Cir., 1960, 283 F.2d 936. Third, directing arbitration puts the industrial relations on a collision course between the order of the Board and a possible award of the arbitrator. See New Orleans Typographical Union v. NLRB, 5 Cir., 1966, 368 F.2d 755.[31] Fourth, this is not really a grievance under the contract. Rather it is, and charges, an alleged unfair labor practice under § 8(a) (5), 29 U.S. C.A. § 158(a) (5) of the Act and this is exclusively within the Board's jurisdiction.[32]

█ None of these reasons outlaw this claim from arbitration. For these are either questions for the arbiter's initial decision or are matters which may be controlled, fully or in part, in the Court review of any enforcement proceedings especially as to the extent to which the award grants post-decertification relief of a kind possibly involving illegal recognition.

28. Grievances 1 and 5, note 5 supra.

29. Grievance 6, note 5 supra.

30.          ARTICLE II
              "Recognition
     "A. The Company recognizes the Union as the collective bargaining agent for its production and maintenance employees, excluding office clerical employees, professional employees, watchmen and/or guards, and all supervisors as defined in the Act, as amended."

31. Compare Carey v. Westinghouse Elec. Corp., 1964, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320.

32. The Successor presses:
     Myers v. Bethlehem Shipbuilding Corp., 1938, 303 U.S. 41, 48, 58 S.Ct. 459, 82 L.Ed. 638, 642;
     Alexander v. Pacific Maritime Ass'n, 9 Cir., 1963, 314 F.2d 690, 692, cert. denied, 1964, 379 U.S. 882, 85 S.Ct. 150, 13 L.Ed.2d 88;
     Belsinger Signs Inc. v. Intern. Broth. of Electrical Workers, D.C., 1964, 231 F. Supp. 741, aff'd, 119 U.S.App.D.C. 243, 339 F.2d 742;
     Portland Web Pressmen's Union v. Oregonian Pub. Co., 9 Cir., 1960, 286 F.2d 4, 10.

### Check-off of Dues [33]

Besides pointing out the obvious fact that this is closely intertwined with the recognition-representation grievance and the decertification of the Union (Part III), the Successor urges that no arbiter could award check-off of dues and hence this issue is not arbitral as a matter of court-declared law. It insists, first, that with loss of representation the Union could not rightfully collect dues since it is rendering no service. Modine Mfg. Co. v. Grand Lodge Intern. Ass'n of Machinists, 6 Cir., 1954, 216 F.2d 326. Second, and more important, § 302 of LMRA, 29 U.S.C.A. § 186, strictly requires written authorizations from the employees to the deducting employer, which is lacking here since the only ones in existence were given to the predecessor employer, not the Successor. Third, for good measure, these violate Alabama law, Ala.Code Title 26, § 375(5) and Title 39, § 201.

Again none of these contentions exclude arbitrability. Each goes only to the possibility of nonenforcement depending on the arbiter's decision.

### The Seniority Issue [34]

The big contention here is that despite express provisions in the contract (Art. VIII) for seniority, the parties by acquiescence had not enforced it. This is a classic question for arbitral determination. Cf. Prima Paint Corp. v. Flood & Conklin Mfg. Co., 1967, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 [June 12, 1967].

### Decision by Arbiter

We should sound this caveat with resepect to our comments in Part IV on arbitrability of these grievances. Nothing we say is even a remote suggestion of how the merits are to, or must, be determined. We must school ourselves against the beguiling importunities of deciding the merits in the guise of adjudicating the court-reserved issue of the scope, if any, of the agreement to arbitrate.[35] Additionally, where unusual situations are presented involving possible clashes between arbitral and Board determinations, between policies for arbitration and for authoritative administrative disposition, the determination that each grievance is arbitral is that and nothing more. Such pronouncement does not begin to put an advance Court imprimatur on the award. That can await enforcement. "We make doubly plain that this opinion in no way indicates what, if any, decision an arbitrator should or must make. We hold merely that he should determine the grievance. Whether the decision or the remedy prescribed is, or is not, supportable is for another day." International Ass'n of Machinists v. Hayes Corp., supra, 296 F.2d at 244. And for all we know this might wash out. Cf. Byers v. Byers, 5 Cir., 1958, 254 F.2d 205; City of Houston v. Standard-Triumph Motor Co., 5 Cir., 1965, 347 F. 2d 194.

The Court's order requiring the Successor to proceed to arbitration of these grievances was therefore correct.

Affirmed.

---

33.  Grievance 3, note 5 supra.

34.  Grievances 2 and 4, note 5 supra.

35.  Oil, Chemical & Atomic Workers Internat'l Union v. Southern Union Gas Co., 5 Cir., 1967, 379 F.2d 774 [June 27, 1967, slip op. p. 5]; United Steelworkers v. American Internat'l Alum. Corp., 5 Cir., 1964, 334 F.2d 147, 151; Local Union No. 787, Internat'l Union of Electrical Workers v. Collins Radio Co.,

5 Cir., 1963, 317 F.2d 214, 216; Sinclair Ref. Co., NLRB, 5 Cir., 1962, 306 F.2d 569, 570; Taft Broadcasting Co. v. Radio Broadcast Technicians Local No. 253, 5 Cir., 1962, 298 F.2d 707, 709; International Ass'n of Machinists v. Hayes Corp., 5 Cir., 1961, 296 F.2d 238, 242, rehearing denied, 1963, 316 F.2d 90; Lodge No. 12, Dist. No. 37, Intern. Ass'n of Machinists v. Cameron Iron Works, Inc., 5 Cir., 1961, 292 F.2d 112, 117–118.