**LOCAL JOINT EXECUTIVE BOARD, HOTEL AND RESTAURANT EMPLOYEEES AND BARTENDERS INTERNATIONAL UNION, Plaintiff,**

v.

**JODEN, INC., Defendant.**

**Civ. A. No. 65–380.**

United States District Court
D. Massachusetts.

Dec. 30, 1966.

John D. O'Reilly, III, Segal & Flamm, Boston, Mass., for plaintiff.

George H. Foley, Hale & Dorr, and Nicholas V. Scali, both of Boston, Mass., for defendant.

## OPINION

JULIAN, District Judge.

This action was tried by the Court sitting without a jury. The case presents two primary issues for decision: 1) Are the plaintiff union and defendant employer engaged "in an industry affecting commerce" so as to give this Court jurisdiction over a suit brought under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185;[1] and 2) on the facts of this case is Joden, Inc. bound as a successor employer to observe the arbitration clause of a collective bargaining agreement entered into by the plaintiff union and Prince Spaghetti House, Inc.? After a careful consideration of all the evidence, the following are my findings of fact.

The plaintiff union (hereafter referred to as the "Union") is a labor organization which represents approximately 3,700 employees in the hotel and restaurant industry in greater Boston. Since 1958 the plaintiff has been the collective bargaining representative of the employees at the Prince Spaghetti House, a restaurant at 595 Washington Street, Boston, Massachusetts. The plaintiff negotiated a series of collective bargaining agreements with the then owner and operator, Prince Spaghetti House, Inc. (hereafter referred to as "Prince"), the most recent of which was executed on September 15, 1963, with an expiration date of September 15, 1965. Article 12 of that agreement provides that all grievances within the scope of the agreement shall be adjusted by arbitration as procedurally outlined therein. (Exh. 1, Article 12.)

Approximately five months prior to April 1, 1965, Stamatos, the president and sole stockholder of the defendant, Joden, Inc. (hereafter referred to as "Joden") began to inspect the operation of the Prince Spaghetti House with a view to purchasing the restaurant. Throughout a period of four to five months, Stamatos visited the restaurant intermittently to observe its operation. During the latter part of this period, Lopez, the treasurer of Joden, visited the restaurant almost every evening for the purpose of watching the employees of Prince Spaghetti House to ascertain which employees he thought Joden should retain after the change in ownership.

Prior to the purchase of the restaurant it was agreed between the representatives of Prince and Joden that Joden was not assuming any liabilities of Prince except for a "Muzak" system.

The evidence does not disclose Prince's liabilities aside from its obligations under the contract between the Union and Prince (Exh. 1) and its arrangement with "Muzak." It was agreed between Prince and Joden that Joden was not assuming any liabilities under the Union contract between Prince and the Union. No representative of Joden was ever shown the union contract prior to or at the time of the purchase of the restaurant; but the representatives of Joden were told by the representatives of Prince that there was a union contract which Prince would terminate by giving notice to the Union and that Prince would terminate the employment of all employees by giving two weeks' notice.

By bill of sale dated April 1, 1965 (Exh. 5), Prince sold to Joden for the

1. 29 U.S.C. § 185 reads in pertinent part as follows:

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without re-spect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 142 defines "industry affecting commerce" as used in this chapter to mean "any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce or tend to burden or obstruct commerce or the free flow of commerce."

price of $50,000 the listed assets [2] of the Prince Spaghetti House, including an inventory of merchandise consisting of food and liquors. The bill of sale recited that Prince transferred to Joden its right, title and interest in the good will of its business located at 595 Washington, Street, " * * * provided, however, that it is understood and agreed that the name PRINCE is expressly excluded from this Bill of Sale and is not to be used by JODEN, INC., its successors and assigns for any purpose whatsoever, and JODEN, INC. agrees to remove immediately upon the execution of this Bill of Sale the name PRINCE from all signs whether inside or outside of said premises * * *."

Article XIII of the collective bargaining agreement between Prince and the plaintiff required the employer to give two weeks' notice to an employee and to the Union upon discharge of any employee (Exh. 1). On March 17, 1965, Prince notified the Union by telephone that Prince was liquidating and going out of business. On March 19, 1965, Prince sent the Union a letter confirming the telephone conversation of March 17 (Exh. 2). Prince gave each of its employees at its restaurant two weeks' written notice by posting a notice above the time clock in the restaurant on or before March 17, 1965, stating that Prince Spaghetti House was going out of business and that the employees were being given two weeks' notice that their employment by Prince Spaghetti House was being terminated.

There are and have been no common directors, no common stockholders and no common officers of Prince and Joden. Neither Prince nor Joden has any proprietary interest in the other except for the mortgage which Prince holds on the assets sold to Joden to secure payment of the purchase price.

Prince continued operating the restaurant as the "Prince Spaghetti House" until closing time on Wednesday evening, March 31, 1965. The restaurant opened the following morning, April 1, with no change in its physical appearance, under the same name, offering substantially the same service to its patrons, but under Joden's ownership and management. No notice of the change of ownership or management was given to the Union. There is no evidence that any notice of the change was given to the public.

On March 31, 1965, Prince was employing twenty-nine or thirty people. Of these thirty, Joden retained twelve to make a total complement of eighteen or nineteen people working for Joden in the first week of its operation of the restaurant.

Certain items of equipment were purchased by Joden after its acquisition of the restaurant but this added equipment did not alter the basic nature of the business enterprise. While the bill of fare has undergone some changes since the sale, with the addition of steaks and full course dinners, it continues to offer a specialty of Italian dishes.[3]

The large sign on the outside of the restaurant reading "Prince Spaghetti House" was changed by Joden to read "Vince Spaghetti House." This was done about ten days after Joden took over the operation of the restaurant. For a period of about two months Joden continued to use menu jackets bearing the name "Prince Spaghetti House." The name "Prince" still remains imbedded in the pavement at the main door of the restaurant.

I find that there was substantial continuity of identity in the restaurant enterprise before and after it was sold by Prince to Joden.

On April 6, 1965, upon being informed by a restaurant employee that the restaurant was still in operation, three representatives of the Union visited the res-

---

2. Accounts receivable are not mentioned. There was no evidence that Prince owned any.

3. This fact is evidenced by the dishes listed in the bills of fare (Exhs. 7, 8, and B), as well as by the retention of the title "Spaghetti House" in the name of the restaurant.

taurant and sought information about the new management. Lopez, the manager, refused to give any such information. The Union representatives complained to Lopez at that time that the new owner was not living up to the collective bargaining agreement. On a later visit the Union representatives were given the name of the new owner and were referred to the attorney for Joden. At some time thereafter, prior to May 27, 1965, the Union made a demand on Joden that Joden apply the terms and conditions of the collective bargaining agreement between Prince and the Union and Joden refused. On May 27, 1965, the attorneys for the Union sent a letter to Joden requesting Joden to submit certain matters to arbitration (Exh. 3).[4]

On June 2, 1965, counsel for Joden sent a letter to counsel for the Union refusing to go to arbitration on the ground that the defendant was not bound by the collective bargaining agreement between the plaintiff and Prince Spaghetti House (Exh. 11). There has never been any arbitration of the Union's grievances.

On or about July 15, 1965, the Union sent a letter to Joden signed by Joseph Stefani, Secretary, stating: "Please be advised that in accordance with Article 15 of an Agreement executed on the 15th day of September, 1963, of our Collective Bargaining Agreement we hereby serve notice of our intention to terminate said Agreement," and requesting negotiations looking toward a contract with increased wages and health and welfare payments. (Exh. A.)

In a decision of the Massachusetts Labor Relations Commission dated August 2, 1965, the Commission concluded that the union represented a majority of the employees of Joden and was and had been since April 1, 1965, the exclusive bargaining representative of the employees of Joden for the purpose of collective bargaining.

I find that the Union made its claims under the collective bargaining contract known to Joden within a reasonable time after it found out that Joden was the new owner of the restaurant, and that it has never abandoned its claims. Joden was in no way harmed or prejudiced by any delay on the part of the Union in asserting its claims under the contract.

Concerning the issue of jurisdiction under section 301, I find the following additional facts. The Union represents approximately 3,700 members. It has collective bargaining agreements with every hotel in Boston and Cambridge, three motels outside of Boston, twenty-seven to thirty-seven restaurants in the Boston area, and Harvard and M.I.T.

Joden, during its first year of operation of the restaurant beginning on April

---

4. These matters were as follows:

"1. Whether the Spaghetti House employees who worked in the Spaghetti House prior to its sale to you are entitled to employment and seniority rights with your company;

"2. Whether your company is obligated to pay the rates of wages set forth in Article 7 of the agreement;

"3. Whether your company is obligated to pay the employees holiday and vacation pay under the agreement;

"4. Whether the union security and grievance provisions of the contract shall remain in full force and effect;

"5. Whether your company was required to maintain benefit plans for employees as provided in Article 14 of said agreement;

"6. Whether any of the employees who formerly worked for Spaghetti House, Inc. and who do not work for your company were discharged or laid off by you and if so whether they were discharged or laid off in accordance with the terms of said agreement;

"7. Whether or not your company is required to work your employees the minimum standard work day and minimum work week and pay overtime pay in accordance with Articles 2 and 3 of the Agreement.

"8. Whether your company is obligated to continue in effect the wage rates, benefit plans, vacations, holidays, seniority and other provisions of the Agreement with respect to Spaghetti House, Inc. employees who continued in your employ."

1, 1965, purchased the following quantities of products, all of which products originated in states other than Massachusetts:

| PRODUCT | DOLLAR VOLUME |
|---|---|
| Anheuser-Busch beer products | $1,500 |
| Jacob Ruppert Knickerbocker beverages | 640 |
| Pastene Wines | 2,200 |
| Prince macaroni and spaghetti (the flour and other ingredients of which are imported from out of state) | 840 |

———◆———

(See plaintiff's motion for pre-trial order granted June 27, 1966.) In addition, Joden made annual purchases in excess of $100 of each of the following products produced outside of Massachusetts: V. O. Whiskey, Seagram 7 Whiskey, Haller's Whiskey, J & B Scotch, Cutty Sark Scotch, Ballantine Scotch, Seagram Gin, Smirnoff Vodka, Old Fitzgerald Bourbon, and County Fair Bourbon. This makes a dollar volume of goods originating outside of the state in excess of $6,180.

## CONCLUSIONS OF LAW

Under section 301 of the Act, jurisdiction is present if the Union and the employer are engaged "in an industry affecting commerce."

The Supreme Court indicated the breadth of jurisdiction under the Act in the case of N. L. R. B. v. Reliance Fuel Oil Corp., 1963, 371 U.S. 224, 83 S.Ct. 312, 9 L.Ed.2d 279.

"This Court has consistently declared that in passing the National Labor Relations Act, Congress intended to and did vest in the Board the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause. * * * Whether or no practices may be deemed by Congress to affect interstate commerce is not to be determined by confining judgment to the quantitative effect of the activities immediately before the Board. Appropriate for judgment is the fact that the immediate situation is representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce." Id. at 226, 83 S.Ct. at 313.

In the same opinion the Court, citing the case of Wickard v. Filburn, 1942, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 said, at pages 226–227 of 371 U.S., at page 314 of 83 S.Ct., that

"Through the National Labor Relations Act, ' * * * Congress has explicitly regulated not merely transactions or goods in interstate commerce but activities which in isolation might be deemed to be merely local but in the interlacings of business across state lines adversely affect such commerce.' "

In the case of Polish Nat. Alliance of United States of North America v. N. L. R. B., 1944, 322 U.S. 643, 647, 64 S.Ct. 1196, 1198, 88 L.Ed. 1509, the Court stated, "When [Congress] wants to bring aspects of commerce within the full sweep of its constitutional authority, it manifests its purpose by regulating not only 'commerce' but also matters which 'affect' * * * interstate commerce." This was the case with section 301, quoted above in footnote 1.

In considering a particular volume of business affecting interstate commerce the Supreme Court has been explicit:

"Examining the Act in the light of its purpose and of the circumstances in which it must be applied we can perceive no basis for inferring any intention of Congress to make the operation of the Act depend on any particular

volume of commerce affected more than that to which courts would apply the maxim *de minimis.*" N. L. R. B. v. Fainblatt, 1939, 306 U.S. 601, 607, 59 S.Ct. 668, 672, 83 L.Ed. 1014.

In considering the *de minimis* doctrine, the Seventh Circuit stated:

"In attacking the Board's jurisdiction, Aurora asserts that the doctrine *de minimis* should be applied to its purchase of $2,000 worth of materials, originating outside the State of Illinois. We do not agree. In National Labor Relations Board v. Suburban Lumber Co., 3 Cir., 121 F.2d 829 (1941), the *de minimis* doctrine was urged to defeat the Board's jurisdiction. In rejecting this argument, the court stated: 'De minimis in the law has always been taken to mean trifles—matters of a few dollars or less.' Id. at 832. The time has not yet arrived when $2,000 is but a trifle." N. L. R. B. v. Aurora City Lines, Inc., 1962, 7 Cir., 299 F.2d 229, 231.

 I find, therefore, that the volume of purchases for the restaurant of goods originating outside of Massachusetts is well beyond the scope of the *de minimis* doctrine, and that this Court does have jurisdiction of this case under section 301 of the Act.

As to the second issue, I hold that on the facts of this case Joden is bound by the arbitration clause of the collective bargaining agreement between the Union and Prince.

In the landmark case of John Wiley & Sons, Inc. v. Livingston, 1964, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898, the Supreme Court established the principle that consistent with the federal policy of settling labor disputes by arbitration rather than by tests of strength of contending forces, a "successor employer" would, in appropriate circumstances, be bound by the arbitration clause of a collective bargaining agreement signed by the predecessor employer. In that case, the Union had entered into a collective bargaining agreement with Interscience Publishers, Inc., which was to continue in force until January 2, 1962. On October 2, 1961, Interscience merged with John Wiley & Sons, Inc. The Court held

"that the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement." Id. at 548, 84 S.Ct. at 914.

The Court explained the rationale behind a decision to bind an employer to a contract which he did not sign or negotiate in these words:

"It would derogate from 'the federal policy of settling labor disputes by arbitration' * * * if a change in the corporate structure or ownership of a business enterprise had the automatic consequence of removing a duty to arbitrate previously established; this is so as much in cases like the present, where the contracting employer disappears into another by merger, as in those in which one owner replaces another but the business entity remains the same." Id. at 549, 84 S.Ct. at 914.

The Court made clear its broad purpose in establishing this precedent:

"Employees, and the union which represents them, ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental to the main considerations. The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship. The transition from one corporate organization to another will in most cases be eased and

industrial strife avoided if employees' claims continue to be resolved by arbitration rather than by 'the relative strength * * * of the contending forces.'" Id. at 549, 84 S.Ct. at 914.

The applicability of the *Wiley* doctrine depends upon the "continuity of identity of the business enterprise." The Supreme Court has neither clearly defined this concept nor laid down any indispensable criteria of continuity. In a recent case, Paper Mill Workers v. Fibre Co., 1965, 62 LRRM 2772, the District Court of the Eastern District of Washington found that the following facts were sufficient to indicate continuity of identity. Pacific Pulp Molding Company sold its entire plant in Wenatchee, Washington, to Great Northwest Fibre Company which carried on a substantially similar type of operation. A "significant number" of the twenty-one former employees of Pacific Pulp were hired by Great Northwest. The district court held Great Northwest bound by the arbitration clause of the collective bargaining agreement between Pacific Pulp and the representative of its Wenatchee employees.[5]

■■ Since no concrete yardstick has been devised, each case must be evaluated for "continuity of identity" on its particular facts. In the instant case I find the following facts to be relevant.

1. A significant number (twelve) of Prince's former employees were retained by Joden in their capacity as restaurant workers. This constituted a majority of Joden's total complement of eighteen or nineteen employees. The retained employees were selected in two ways; some were chosen by Lopez, an agent of Joden, who visited the restaurant nearly every night for two weeks prior to April 1,

1965, for the purpose of inspecting the help, and some were chosen by Prince's chef, who was also retained by Joden.

2. The plaintiff Union continued to be the exclusive collective bargaining representative for all of Joden's employees after April 1, 1965.

3. Prince continued operation of the restaurant up to and including March 31, 1965, and Joden opened the restaurant for business the following morning, April 1, 1965, with no period of delay for alteration of the premises or operation.

4. The nature of the business enterprise remained substantially unchanged across the change in ownership.

5. While the name on the outside of the restaurant was changed, several days after April 1, from the "Prince Spaghetti House" to the "Vince Spaghetti House," and the name "Prince Spaghetti House" was eliminated from the menu jackets about two months after April 1, the appeal of the restaurant was focused on substantially the same clientele. This is indicated by the fact that the good will of Prince was specifically inventoried in the bill of sale.[6]

The Supreme Court has made its position clear:

"The preference of national labor policy for arbitration as a substitute for tests of strength between contending forces could be overcome only if other considerations compellingly so demanded." John Wiley & Sons, Inc. v. Livingston, supra, 376 U.S. at 549, 84 S. Ct. at 914.

I find no such considerations in this case. Rather, I find that the substantial similarity of operation and continuity of identity of the business enterprise be-

5. It is to be noted that in that case the contract of sale of the plant included a provision that Great Northwest would not assume "seller's employment contracts, union contracts, or other labor agreements." Similarly, in United Steelworkers of America v. Reliance Universal, Inc., 1964, 3 Cir., 335 F.2d 891, the Court held that a provision in the contract of sale that the buyer "shall not assume any obligation of the * * * [sell-

er] under any collective bargaining agreement" did not preclude the application of the *Wiley* doctrine.

6. Although the sale agreement specifically required Joden to remove "the name PRINCE from all signs whether inside or outside of said premises," lettering on the sidewalk at the entrance to the restaurant reading PRINCE still remains.

fore and after the change in ownership require application of the *Wiley* doctrine in the present case.

Accordingly, I find for the plaintiff Union.

Judgment will be entered ordering the defendant Joden to submit the Union's claims to arbitration as provided in Article 12 of the collective bargaining agreement (Exh. 1).