PUERTO RICO LABOR RELATIONS BOARD, Petitioner, *v.* CO-OPERATIVA AZUCARERA CENTRAL JUNCOS, Respondent.

No. O-69-130.    Decided January 30, 1970.

308

*José F. Rodríguez Rivera, Acting Solicitor General, Celia Canales González, Marta Ramírez Vera,* and *José E. Rodríguez Rosaly* for petitioner. *Fiddler, González & Rodríguez, Eduardo Négron Rodríguez,* and *Pedro Pumarada* for respondent.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

On April 24, 1968, Juan Guzmán Rosado filed a charge against the Cooperativa Azucarera Central Juncos, hereinafter "the Cooperativa," alleging that it had breached the collective bargaining agreement in force entered into with the Asociación de Azucareros Profesionales, § 8(1)(f) of the Labor Relations Act, 29 L.P.R.A. § 69(1)(f), in unjustly discharging him from his employment as sugar laborer of the Central Juncos. The corresponding complaint against the aforementioned cooperative and the Sugar Producers Association of Puerto Rico was authorized. After the proper steps were taken, the Board adopted the findings of fact and conclusions of law of the Trial Examiner, it rendered its decision on May 7, 1969, and ordered the Cooperativa to:

"1. Cease and desist from:

"Violating in any manner the terms of the collective bargaining agreement in force with the Asociación de Azucareros Profesionales (regular sugar laborers) de Puerto Rico, which is applicable to the state of facts which gave rise to the above-entitled case.

"2. To take the following affirmative action:

"a) To offer Juan Guzmán Rosado the position of sugar laborer he held in the Central Juncos or one substantially equivalent, and to reimburse him the wages he did not receive as a result of respondent's actions against him.

"b) To post . . . copies of [a] Notice . . . ."

In view of respondent's refusal to comply with the order entered, the Board appealed to this Court for us to enforce it.[1]

---

[1] On the date the decision and order were issued, the Cooperativa had offered, since February 25, 1969, employment to petitioner in the position of second sugar laborer which was the one he held upon ceasing in his functions. Therefore, the provision of the order about petitioner's replacement was not justified.

The complaint against the Sugar Producers Association did not prosper because said entity had merely acted in representation of the Cooperativa in the bargaining and signing of the agreements.

In its brief showing causes the Cooperativa basically alleges that (a) error was committed in determining that the Cooperativa was an employer succeeding C. Brewer Puerto Rico, Co., to which we shall refer as Brewer, subject to the collective bargaining agreements entered into, and (b) assuming that the agreements were applicable, under the facts considered established, it could not be concluded that respondent violated the agreement in force. For the consideration of these assignments it is necessary to make a recital of the agreements to which the complaint refers and of the facts about the employer's substitution and the so-called discharge of petitioner Guzmán.

—A—

## The Agreements

1) On April 29, 1964, the Sugar Producers Association, known as the S.P.A. (A.P.A., in Spanish), in representation of fourteen sugar mills and one refinery, among which there was the Central Juncos, operated then by Brewer, and the Asociación de Azucareros Profesionales (regular sugar laborers) de Puerto Rico, on behalf of the sugar laborers working in said sugar mills and refinery, bargained an agreement to govern their relations during the grinding seasons of 1964, 1965, and 1966. Article X of said agreement provided, as to the notice in case of suspension of the grinding season or sale or conveyance of the mill, as follows:

"In case the Employer during the term of this Agreement decides to *interrupt the grinding of cane during any of the grinding seasons subsequent to that of 1964,* or to sell, convey, lease or in any other manner convey the domain, possession or management of the mill or mills it operates to any other person, firm or entity, shall be under the obligation to notify in writing said suspension of the grinding season, sale, conveyance, lease or transfer to each one of the sugar laborers rendering services in

the mill or mills concerned within the thirty days following the termination of the last grinding season worked, *for which reason the parties thus affected by said notice shall be relieved from all further responsibility concerning the continuation of this Agreement.* If any Sugar Mill whatsoever is transferred from its location in Puerto Rico to be operated by its same present owner, the sugar laborers of said Sugar Mill shall have priority to be employed in its new location."

2) On February 3, 1967 the same parties agreed to extend the previous agreement until December 31, 1967, on the same terms and conditions under which it had governed. It was expressly stated that:

"The employer makes it clear that on this condition the Central Juncos of C. Brewer Puerto Rico Company *will not operate after the 1967 grinding season."*

3) On January 5, 1968, the S.P.A., representing, among other sugar mills, the Cooperativa Azucarera Central Juncos and the Asociación de Azucareros, entered into a new collective bargaining agreement to govern their relations during 1968, 1969, and 1970. Article VIII(H) of this agreement, drafted in an identical manner with the previous agreement, says:

"H. The sugar laborers shall not be bound to report to the Employer, except on the date when the grinding of cane is actually going to start and they are summoned to perform their duties as such sugar laborers; but if the Employer summons them to observe the testing of the devices of their department, they cannot refuse thereto, and from that date on they shall start receiving their whole wages . . . except for acts of God. Likewise, they shall not refuse to appear when the Employer summons them to work in any other factory in Puerto Rico controlled by the same owners, provided the Sugar Mill or refinery where the sugar laborer is working has not finished its grinding season and whenever they are furnished with the same facilities as those enjoyed by the employees of said factory, and provided a strike of the sugar laborers does not exist therein. . . ."

—B—

*The Substitution of the Employer*

Before 1967, Brewer had operated several sugar mills in Puerto Rico, among which there was the Central Juncos. In addition to this industrial activity it had large extensions of land devoted to the cultivation of cane for the production of sugar through the grinding in its sugar mills. The agricultural as well as the industrial phase were directed and controlled from the company's main offices. Around the beginning of February 1967, Brewer reported to the Department of Agriculture of Puerto Rico that it was ready to finish its operations in the Island. In order to prevent the crisis that said closing meant in the agricultural sector, especially in the towns where the mills were located, a series of studies and measures were started directed to determine the feasibility of continuing the operations. The Land Authority of Puerto Rico entrusted the engineer Julio Rodríguez Chacón, at that time Manager of the Central Cambalache, to perform a study to explore the possibility of having said agency operate the Centrales Fajardo and Juncos. Rodríguez recommended the creation of a cooperative of *colonos* to operate the Central Juncos, several meetings having been held on that particular, with a view to determine the most convenient form of acquiring the mill. A very important meeting took place in April 1967, where the following were present: the Secretary of Agriculture, Hernández Agosto; the Executive Director of the Land Authority, Rivera Hernández; the Executive Director of the Land Administration, Mejías Santana; a group of *colonos* of the Central Juncos, and Rodríguez Chacón.

On April 18, 1967, the Cooperativa Azucarera Central Juncos was organized by a group of the cane *colonos* of that area "to be prepared in case the Government allowed them

to operate the Central Juncos." The organization was officially recorded in the Department of State on the following May 18.

Upon the termination of the grinding season in June 1967, Brewer sent a letter to each one of the sugar laborers who worked in its mills, including Juan Guzmán Rosado, notifying them of the discontinuation of the industrial operations of the enterprise.

On June 9, 1967, the Legislature of Puerto Rico approved Joint Resolution No. 50, effective July 1, appropriating the amount of $1,281,000 to the Land Administration of Puerto Rico for the acquisition of the Centrales Fajardo and Juncos.

In July 1967, the Cooperativa appointed Rodríguez Chacón to the position of Manager of the Central Juncos. In such capacity he participated in the negotiations which were carried out for the purpose of leasing the mill building. Although the lease contract had not been formally executed, on August 1 the Land Administration authorized the Cooperativa to take possession of the mill. The contract was executed on September 13 for a term of ten years to be reckoned as of August 1. A provision was included granting an option to the Cooperativa to acquire the mill.

Upon taking possession on August 1, Rodríguez found that the factory, the offices, the warehouses, and the rest of the mill's premises were closed. There were no employees working. Steps were taken to get personnel, which in their majority were the former Brewer employees; the new employees came to replace "those who retired because they were old and expressed their desire not to work anymore." During the so-called dead season the necessary repairs were made and the mill was prepared to operate during the 1968 grinding season which was to start about the middle of February 1968.

—C—

*The Facts About the "Discharge"*

The grinding season of 1968 of the Central Juncos was fixed to start on February 15. Before that date the sugar laborers who had worked for Brewer, with the exception of complainant Guzmán, inquired about the continuation of the operations and the utilization of their services. Guzmán knew that the beginning of the grinding season in said mill was to take place about the middle of February. He had been warned prior to the beginning of the grinding season that the Cooperativa was going to operate the central. He did not take any steps, personally, to apply for employment until March 4, more than two weeks after the beginning of the grinding. Though he used to go by the central during the month of December, he did not do it that year, explaining that a relative he visited in Humacao had died, and in whose home he was staying for two or three days.

On January 31 the Cooperativa, through the Manufacturing Supervisor, sent a letter to Guzmán, to 70 Liceo Sur Street in Mayagüez, which said: "I would be grateful if you would let me know, as soon as possible, if you are available and wish to continue working as second sugar laborer with this Enterprise, Cooperativa Azucarera Central Juncos." This address was the one appearing in an address book which the former manager had left. The letter was returned by the postal authorities. In view of this situation, the Manufacturing Supervisor requested Guzmán's fellow workers to try to locate him. The latter took steps through the State Police, but from the Mayagüez Police Station they informed that they had been fruitless. They asked the President of the Union for Guzmán's address and he answered that he did not know it. The grinding season being about to begin, the Cooperativa "agreed with sugar laborer Manuel Román that if once the grinding season was started Juan Guzmán Rosado

had not appeared, he would hold said position." It was not until February 22 that Román was employed (he had worked with the Central Río Llano until that time). During the previous week the other two sugar laborers had worked overtime.

On previous occasions Brewer informed Guzmán of the beginning of the grinding season by means of letters and telegrams addressed to 73 Liceo Sur, which is the house across from 70 Liceo Sur. The previous year, in February 1967, Brewer's former manager had addressed a telegram to Guzmán to 70 Liceo Sur, so that he would "report" to work. Guzmán received the telegram and complied with what was required of him.

On March 4, Guzmán sent a telegram to the manager, inquiring whether "I have got work or not," which was answered four days later, letting him know of the steps taken to locate him and of the substitution made after prior notice to the Asociación de Azucareros.[2]

1. In *Beaunit of Puerto Rico* v. *L.R.B.*, 93 P.R.R. 496 (1966), we stated that the mere fact of the replacement of an employer by another, or of a representative of the workers by another—situation which was specifically considered—did not have the effect of automatically rescinding any existing collective bargaining agreement between the parties, it being contrary to the social interest and to the public policy that industrial peace exist. We relied mainly on *Wiley & Sons* v. *Livingston*, 376 U.S. 543 (1964); *Wackenhut Corp.* v. *International U., United Plant Guard W.*, 332 F.2d 954 (9th Cir. 1964), and *United Steelworkers of Amer.* v. *Reliance Univ., Inc.*, 335 F.2d 891 (3d Cir. 1964).

---

[2] Pursuant to the contract, the sugar laborers are guaranteed, once they are employed, a total of 920 regular working hours on the basis of 40 hours a week during 23 weeks in each grinding season. See the contract which appears in *Sec. of Labor* v. *Fajardo Eastern Sugar*, 97 P.R.R. 220 (1969).

■ In general terms a substantial similarity in the operation and a continuity of the identity of the enterprise before and after the change are required, so that it be considered that the new employer shall assume obligations contracted by the previous employer. *Wiley & Sons v. Livingston, supra.*[3] *Assumption of Union Contracts by Successors: Court Decisions and Arbitration Awards,* 20 Arb. J. 20 (1965); *Implications of the John Wiley Case for Business Transfers, Collective Agreements and Arbitration,* 18 S.C.L. Rev. 413 (1966); Fanning, *The Purchaser and the Labor Contract— An Escalating Theory,* 1967 Labor Relations Yearbook 284; Notes in 44 N.Y.U.L. Rev. 220 (1969); 68 Colum. L. Rev. 1602 (1968); 2 Ga. L. Rev. 574 (1968); 52 Iowa L. Rev. 95 (1966); 60 Nw. U.L. Rev. 224 (1965); 73 Yale L.J. 1459 (1964); 16 Syracuse L. Rev. 164 (1964), and U. Ill. L. F. 847, vol. 1964. In this respect it has been held that the successor employer is only bound by the agreement under those circumstances which are not "unreasonable or inequitable." *United Steelworkers of Amer. v. Reliance Univ., Inc.,* 335 F.2d 891, 895 (3d Cir. 1964).[3a]

■ The consideration of several factors for the purpose of determining the existence of this similarity and continuity

---

[3] The transaction bringing about the change in the employer's identity may be through a corporate merger, as in *Wiley, supra,* and *McGuire v. Humble Oil & Refining Company,* 247 F.Supp. 113 (D.S. N.Y. 1964); or in any other manner which implies a transfer of assets, *Wackenhut Corp. v. International U., United Plant Guard W.,* 332 F.2d 954 (9th Cir. 1964); *United Steelworkers of Amer. v. Reliance Univ., Inc.,* 335 F.2d 891 (3d Cir. 1964); *United States Gypsum Co. v. United Steelworkers of Amer.,* 384 F.2d 38 (5th Cir. 1967); *Local Joint Exec. Bd., Hotel & R. Emp. & Bar. Int. U. v. Joden, Inc.,* 262 F.Supp. 390 (Mass. 1966). *Cf.,* in the case of assignment of lease, *Retail Store Emp. U., Local No. 954 v. Lane's of Findlay, Inc.,* 260 F.Supp. 655 (D.N. Ohio 1966).

[3a] In *L.R.B. v. Club Náutico,* 97 P.R.R. 376 (1969), we considered the liability of a successor employer for unfair labor practices incurred by the previous employer. See, also, *United States Pipe and Foundry Company v. N.L.R.B.,* 398 F.2d 544 (5th Cir. 1968); and *Ramada Inns, Inc.,* 68 L.R.R.M. 1209 (1968).

has been suggested, to wit: (1) the existence of a substantial continuation in the same business activity;[4] (2) the utilization of the same operating plant;[5] (3) the employment of the same or substantially the same labor force;[6] (4) to maintain the same supervisory personnel;[7] (5) to use the same equipment and machinery and to employ the same methods of production;[8] (6) the production of the same products and

---

[4] *International Chemical Workers Union* v. *N.L.R.B.*, 395 F.2d 639 (D.C. Cir. 1968); *Makela Welding, Inc.* v. *N.L.R.B.*, 387 F.2d 40, 46 (6th Cir. 1967); *United States Gypsum Co.* v. *United Steelworkers of Amer.*, 384 F.2d 38 (5th Cir. 1967); *Overnite Transportation Company* v. *N.L.R.B.*, 372 F.2d 765, 768 (4th Cir. 1967); *N.L.R.B.* v. *Malcolm Konner Chevrolet, Inc.*, 338 F.2d 972 (3d Cir. 1964); *Retail Clerks Union Local No. 1552* v. *Lynn Drug Company*, 299 F.Supp. 1036 (D.E. Ohio 1969); *International B. of P.S. & P.M.W.* v. *Great N.W. Fibre Co.*, 263 F.Supp. 167 (D.E. Wash. 1965); *Local Joint Exec. Bd., Hotel & R. Emp. & Bar. Int. U.* v. *Joden, Inc.*, 262 F.Supp. 390, 396 (Mass. 1966); *Retail Store Emp. U., Local No. 954* v. *Lane's of Findlay, Inc.*, 260 F.Supp. 655 (D.N. Ohio 1966); *Tallakson Ford, Inc.*, 68 L.R.R.M. 1136 (1968); *Thomas Cadillac, Inc.*, 67 L.R.R.M. 1504 (1968); *West Suburban Transit Lines, Inc.*, 62 L.R.R.M. 1101 (1966); *Sinko Mfg. & Tool Co.*, 60 L.R.R.M. 1145 (1965).

[5] *Overnite Transportation Company* v. *N.L.R.B.*, *supra*; *Retail Clerks Union Local No. 1552* v. *Lynn Drug Co.*, *supra*; *International B. of P. S. & P.M.W.* v. *Great N.W. Fibre Co.*, *supra*; *Randolph Rubber Co.*, 59 L.R.R.M. 1108 (1965).

[6] *International Chemical Workers Union* v. *N.L.R.B.*, *supra*; *Overnite Transportation Company* v. *N.L.R.B.*, *supra*; *N.L.R.B.* v. *John Stepp's Friendly Ford, Inc.*, 338 F.2d 833 (9th Cir. 1964); *Retail Clerks Union Local No. 1552* v. *Lynn Drug Company*, *supra*; *Local Joint Exec. Bd. Hotel & R. Emp. & Bar. Int. U.* v. *Joden, Inc.*, *supra*; *Texas Eastman Co.*, 71 L.R.R.M. 1098 (1969); *Joe Robertson & Son, Inc.*, 70 L.R.R.M. 1396 (1969); *Tallakson Ford, Inc.*, *supra*; *Thomas Cadillac, Inc.*, *supra*; *Valleydale Packers, Inc.*, 64 L.R.R.M. 1212 (1967); *West Suburban Transit Lines, Inc.*, *supra*; *Hemisphere Progressive Corp.*, 60 L.R.R.M. 1033 (1965); *Randolph Rubber Co.*, *supra*.

[7] *International Chemical Workers Union* v. *N.L.R.B.*, *supra*; *Tallakson Ford, Inc.*, *supra*; *Thomas Cadillac, Inc.*, *supra*; *Sinko Mfg. & Tool Co.*, *supra*; *Paramount Paper Products Co.*, 60 L.R.R.M. 1079 (1965); *Skaggs Drug Centers*, 58 L.R.R.M. 1106 (1964); *McLaughlin Industrial Distributors, Inc.*, 49 L.R.R.M. 1545 (1962).

[8] *N.L.R.B.* v. *Tempest Shirt Manufacturing Co.*, 285 F.2d 1 (5th Cir. 1960); *Paramount Paper Products Co.*, *supra*; *Randolph Rubber Co.*, *supra*; *New Laxton Coal Co.*, 49 L.R.R.M. 1287 (1961).

the rendering of the same services;[9] (7) continuity of identity;[10] and (8) the operation of the business during the transfer period.[11] A combination of an adequate number of these factors is conclusive as to the continuation of the agreement's obligations. Gordon, *Legal Questions of Successorship*, 3 Ga. L. Rev. 280, 284 (1969); Goldberg, *The Labor Law Obligations of a Successor Employer*, 63 Nw. L. Rev. 735 (1969); Platt, *The N.L.R.B. and the Arbitrator in Sale and Merger Situations*, N.Y.U. 19th Conf. on Labor 375 (1967). Note, *The Successor Employer's Duty to Arbitrate: A Reconsideration of John Wiley & Sons, Inc.* v. *Livingston*, 82 Harv. L. Rev. 418, 428–432 (1968). It is advisable to set forth that the interpretations of the Board and the courts have arisen in cases involving the refusal to bargain collectively, §§ 8(a)5 and 8(b)3 of the Federal Labor Relations Act, 29 U.S.C. § 158(a)5 and 29 U.S.C. § 158(b)(3), and that precisely, the matter concerning the assumption of other obligations derived from the agreement in one of the twilight areas in which the formulation of standards is in continuous process. However, there is no doubt that the view suggested in *Wiley*, *supra*, of the need to establish a balance between the employers' right to "independently rearrange their business," and to recognize "some protection to the employees from a sudden change in the employment relationship,"[12] prevails.

■ In the case at bar it is necessary to clarify, previously, that although faint, there is a relationship derived

---

[9] *Overnite Transportation Company* v. *N.L.R.B.*, *supra*; *N.L.R.B.* v. *Downtown Bakery Corp.*, 330 F.2d 921 (6th Cir. 1964); *Texas Eastman Co.*, *supra*.

[10] *Local Joint Exec. Bd., Hotel & R. Emp. & Bar. Int. U.* v. *Joden, Inc.*, *supra*.

[11] *Retail Clerks Union Local No. 1552* v. *Lynn Drug Company*, *supra*; *Ellary Lace Corp.*, 72 L.R.R.M. 1063 (1969).

[12] Three important areas where a change of employer may affect the employees are those concerning the accrued benefits of the employment, security in the employment, and seniority rights.

from the collective bargaining agreement entered into by Brewer, which requires the ascertainment of whether the Cooperativa should be considered as a successor employer. The trial examiner refers to it as the obligation of the new employer to "respect the status of the sugar laborers of the Central Juncos at the moment when the original employer ceased as such." This permanent status is expressly recognized in the agreement in force in its Art. VII— ". . . said Employer considering that *the status acquired* by said sugar laborers should remain permanent for the benefit of the parties . . .," which is identical in language with its respective section in the previous agreement.[13]

The existence of sufficient factors which allow the Cooperativa to be considered as a successor employer is inferred from the facts stated above. The business activity is substantially the same, sugar production. The fact that Brewer was engaged in agricultural activities is not decisive, for the agreement we are considering exclusively refers to a phase of the industrial elaboration of sugar. In any event, the proper thing to do is to consider the unit of work concerned, and as to the latter, it is exactly the same: under Brewer, the Central Juncos was engaged, and is engaged now by the Cooperativa, in the elaboration of sugar. The utilization of the same plant for the operations is undeniable, as well as that of the same equipment and machinery. The same labor force has been substantially employed, and as in a revealing manner the manager asserts that the new employees replaced

---

[13] It should be noted that they request to enforce the order to cease and desist from violating the terms of the agreement *in force* with the Asociación de Azucareros Profesionales, "which is applicable to the state of facts which gave rise to the case." Since the Cooperativa was a contracting party in the agreement *in force*, it would seem that there was no situation of successor employer. However, the right for a permanent employment has its roots in the previous agreement, and the alleged violation of the agreement consisting in the "discharge" of a sugar laborer originates in the violation of that right to a permanent employment.

"those who retired because they were old and expressed their desire not to work anymore." Likewise, for all practical purposes, the business continued its operation during the transition period, since it was closed only during the month of July, and already since August, the Cooperativa, which had been organized since April to operate the business when Brewer ceased, had taken charge and started to carry out the maintenance, conservation, and repair operations which are the ones performed during the so-called dead season. Besides, to these effects, it should not be forgotten that we are dealing with a seasonal industry. *Cf. Rodríguez* v. *Eastern Sugar Associates*, 82 P.R.R. 563 (1961).

Respondent argues that the trial examiner erred in his interpretation to the effect that Art. X of the agreement which we have copied above was not applicable to the situation we are discussing, since the interruption of the grinding did not occur *during* the grinding season, even when the latter had terminated. We agree that the error was committed as a result of the consideration given by the examiner to the phrase "to interrupt the grinding of cane during any grinding season," when credit should have been given to the entire phrase "to interrupt the grinding of cane during any grinding season *subsequent to that of 1964*." However, that is not conclusive to hold that the agreement and the obligations which arise therefrom expired, for the effect of the notice set forth in said article covers only "the parties thus affected by said notice [who] shall be relieved from all further responsibility concerning the continuation of this Agreement." In no way is the successor employer exempt from the obligations which might be incumbent upon him. But even assuming that the agreement had expired at the time when the Cooperativa took charge of the Central Juncos, this by itself would not be conclusive, when it is shown that no important changes took place in the personnel, the methods, and the equipment and machinery employed, as decided in

*Overnite Transportation Company* v. *N.L.R.B.*, 372 F.2d 765 (4th Cir. 1967), *cert. den.*, 389 U.S. 838 (1967). See, *International B. of P.S. & P.M.W.* v. *Great N.W. Fibre Co.*, 263 F.Supp. 167 (D.E. Wash. 1965).

The fact that Brewer did not make a direct transfer to the Cooperativa, but to the Land Administration, does not have the importance claimed either, since the relevant thing is the continuance of the operation of the enterprise and not the subtleties of title.

*Ellary Lace Corp.*, 72 L.R.R.M. 1063 (1969), on which respondent relies, rather supports our conclusion, since it is clearly outstanding in its facts for the notable absence of a combination of the factors which have been suggested to determine the continuity and identity necessary for a successor employer. It dealt with a new employer who only acquired part of the equipment and leased a substantially smaller area of the physical plant; that he only employed one-third of the supervisors and 17 employees from about 115 employed by the previous owner; and that its operations began seven months after the other company ceased operations, engaging in a limited activity of the industrial branch.

To sum up, we decide that the Cooperativa is a successor employer, and as such, it assumed the obligations which may arise from the collective bargaining agreement which was in force until December 31, 1967, and which are connected with the facts which gave rise to the charge for unfair labor practice.

2. As we said in advance, the "discharge", to which the charge of unfair labor practice refers, results from the failure of the Cooperativa to employ Juan Guzmán Rosado, as sugar laborer, position he had fulfilled for a period of eleven years under Brewer's management, during the grinding season of 1968. The trial examiner concluded that the respondent enterprise had not performed the obligation im-

posed by Art. VIII (H) of the agreement—"The sugar laborers shall not be bound to report to the employer, except on the date when the sugar grinding is actually going to start *and they are summoned to perform their duties as such sugar laborers . . .*"—to notify Guzmán of the need of his services and the date when he should start to work. It is expressly admitted that the Cooperativa strived fruitlessly to locate Guzmán, but it is indicated that (a) the telegraph was not used to inform him of the beginning of the grinding season; and (b) "there comes to our mind . . . the doubt of how is it possible that, when the Cooperativa requested the assistance of the other sugar laborers to locate the complainant, it did not find out [his] correct address."

We agree that the enterprise had to take measures to notify the sugar laborers. However, we cannot accept that under the same facts which the examiner considered established, it can be held that the Cooperativa did not comply suitably with this obligation. If something can be affirmed it is that the record reveals a substantial compliance and the fulfillment of the steps which could be reasonably requested. There is no doubt that the Cooperativa was interested in Guzmán's services, as it appears from the text of the letter sent to him and that because of an error in the address to which it was sent, it was not claimed and was returned. The error in the address has an admissible explanation, it was the one appearing in the only available means in the central's offices in an address book left there by the former manager. The failure to use the telegraph is no reason to justify the conclusion that the agreement was breached. It is true that Guzmán had received a telegram the previous year at the wrong address, but aside from the fact that Brewer was the sender and not the Cooperativa, it leads us to conclude, precisely, that a letter sent to the same address could also have been received. To all this it is added that when the letter was returned, steps were taken to locate him through his fellow

workers and the Union's representative, that the hiring of the replacement was delayed for a week, since the beginning of the grinding season, and that he was only offered the position under the condition that Guzmán did not appear. It cannot be ignored either that Guzmán, being aware of the beginning of the grinding season about the middle of February, waited until two weeks later to claim his position.

All the circumstances having been considered, we conclude that the Cooperativa did not incur breach of the agreement charged against it.

The petition of the Labor Relations Board to enforce the order issued on May 7, 1969, in the case CA-3765, will be dismissed.

Mr. Chief Justice Negrón Fernández and Mr. Justice Hernández Matos did not participate herein.